## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**STEVE HESS,**

      **Plaintiff,**

**v.**                                  **Civil Action No. 1:10cv192**
                                                 **Judge Keeley**

**ADRIAN HOKE, Warden;**
**DR. DAVID PROCTOR,**
**JANE DOE (ALLY) (Wexford**
**Medical Sources); and**
**TRISTAN TENNEY,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I.  Procedural History

On November 5, 2010, plaintiff initiated this case by filing a civil rights complaint under 42 U.S.C. § 1983. In the complaint, the plaintiff alleges claims of deliberate indifference to a serious medical condition, medical negligence and medical malpractice.

Plaintiff, proceeding *pro se,* was granted permission to proceed *in forma pauperis* on November 19, 2010, and paid an initial partial filing fee on December 10, 2010. After a notice of deficiency was corrected via a January 3, 2011 Show Cause Order to the plaintiff, the plaintiff filed his complaint on a corrected form on February 25, 2011.

On May 20, 2011, upon a preliminary review of the file, the undersigned determined that summary dismissal was not appropriate, and directed the United States Marshal Service to serve the Complaint. Accordingly, the Clerk was directed to forward a completed summons and a completed

1

Marshal 285 Form for each defendant to the United States Marshal Service.

On June 16, 2011, the defendant Adrian Hoke filed a Motion to Dismiss with a memorandum in support. On June 17, 2011, the defendants Dr. David Proctor, Jane Doe (Ally), and Tristan Tenney filed a Motion to Dismiss with a memorandum in support. On June 21, 2011, because plaintiff is proceeding *pro se*, a <u>Roseboro</u> Notice[1] was issued. On July 18, 2011, the plaintiff filed his response to defendants' motion(s) to dismiss. On July 25, 2011, defendant Adrian Hoke filed his reply to plaintiff's response, and on July 29, 2011, defendants Dr. David Proctor, Jane Doe (Ally), and Tristan Tenney filed their reply to plaintiff's response.

This case is before the undersigned for a preliminary review and report and recommendation pursuant to LR PL P 83.02, <u>et</u> <u>seq.</u>, and 28 U.S.C. §§ 1915(e) and 1915A.

## II. Contentions of the Parties

### A. The Complaint and Memorandum of Law (Dkt.# 1 and 20)

In the complaint, the plaintiff alleges that his Eighth and Fourteenth Amendment rights were violated when, despite being on notice of the potential for great harm due to "unsanitary" conditions, including "dangerous levels" of Methicillin-resistant-staphylococcus aureus ("MRSA") at the prison,[2] all four defendants, intentionally and with deliberate indifference to his safety and health, failed to protect him and failed to warn him of the risk for serious infection. Further, he alleges, the

---

[1] <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir. 1975) (finding that the court must inform a *pro se* plaintiff of his right to file material in response to a motion for summary judgment).

[2] Plaintiff avers that prison officials "knew of such dangers in that the prison could not pass standard safety inspections provided by the American Accreditation Association ["ACA"] in order to obtain accreditation from such agency." (Dkt.# 20-1 at 10).

"prison authorities" defendants[3] failed to enact and maintain adequate infection control policies and procedures within the facility, including quarantining inmates who were infected with MRSA. Plaintiff alleges that as a result, Defendants Hoke ("Hoke") and Tenney ("Tenney") "allowed . . . [him] to contract the bacteria." Finally, plaintiff alleges that after he contracted MRSA, all four of the defendants were medically negligent and committed medical malpractice when they first denied and then postponed his treatment for a MRSA infection in his right leg.

In support of these claims, plaintiff asserts that from "about 2006 through 2010 the . . . [ACA] officials, the West Virginia Health Department, and prison safety inspectors conducted frequent inspections of the Huttonsville Correctional Center ("HCC"). (Dkt.# 20-1 at 11).

After the inspections, plaintiff contends that health officials warned HCC that unsanitary conditions in the prison's kitchen, dorms and other areas were placing inmates at risk of serious health problems, including MRSA. (Id. at 11).

Plaintiff avers that in early 2010, the "prison authorities passed out pamphlets and placed up memos in medical in regards to how to treat STAPH infections and how to keep from spreading such infections to others. However, no warning was provided to inmates not already infected with the bacteria." (Id. at 10).

Plaintiff alleges that in "an effort to pass future . . . [ACA inspections]," Hoke renovated the kitchen and other frequented areas of the prison, including bathrooms and bath areas. Despite these efforts, plaintiff contends, Hoke did not purchase disinfectant sprays to inhibit to spread of communicable diseases spread among the prison population. Plaintiff further alleges that "prison officials" (presumably Hoke and Tenney) did not institute policies to quarantine inmates infected

[3] It is unclear to whom plaintiff is referring as "prison authorities," but the undersigned takes this to mean Hoke and Tenney, as Warden and Medical Director, respectively.

with MRSA, in order to protect inmates who had not yet contracted it.

Plaintiff avers that on or about June 28, 2010, he contracted a MRSA skin infection on his right leg.

Throughout the three-week period from June 28, 2010 through July 18, 2010, plaintiff alleges that he repeatedly sought treatment for his MRSA infection from defendant Jane Doe (Ally) ("Ally"), a nurse at the prison. Plaintiff alleges that despite his daily entreaties throughout all of that entire three-week period, Ally continuously denied plaintiff medical treatment and refused to place him on the list to see the prison doctor.

Plaintiff avers that while he was infected with MRSA he was not quarantined. Instead, he alleges, he remained housed in the general population with approximately 43 other inmates, who received no warning about his infection. Plaintiff alleges that the prison's non-quarantine policy regarding MRSA infections is a contributing factor to his injury.

More specifically, plaintiff alleges that all four defendants were aware of the threat to his health and safety but did nothing to protect him. Further, he alleges that all four defendants delayed his treatment for MRSA.

As for defendant Ally, plaintiff alleges she was negligent in her treatment of his serious medical needs when she failed to place him on the list to see the doctor and when she refused him treatment for his infection for three weeks.

As a consequence of the delay in treatment, plaintiff's "excruciatingly painful" wound grew from a pea-sized area to an area the size of a quarter, and when it finally healed, he was left with a permanent scar.

Plaintiff avers that he has exhausted his administrative remedies by filing grievances to inform the defendants of his complaints. He alleges that he "filed a level one grievance and it was denied,

that denial was affirmed at both levels two and three." (Id. at 2).[4]

[4]Plaintiff provides copies of three WV Division of Correction Inmate Grievance Form reports and a WV Division of Corrections Memorandum to support his allegations.

The first grievance form, Grievance # 10-HCC-C-90, is dated July 21, 2010, is addressed to "Unit Manager Thompson," and the nature of the grievance as described by plaintiff is "I've had a severe infection in my right leg for 10 day's [sic] now. I have not consulted with the doctor 1 time over this. This wound has not gotten any better with the antibiotics I've been taking and is severely painful to walk on. Something more needs to be done before this infection spreads or my leg rots off. **No one even bothered to culture this wound until after I was on the antibiotics for 4 days.** This wound is causing swelling and serious pain, something more obviously need's [sic] to be done before this gets worse than it already is." *Signed* "Steve Hess # 28837." (Dkt.# 20-1 at 30) (emphasis added). The response by the "Unit Manager" is dated July 22, 2010, and states "fwd to med.," with a nearly illegible "Unit Manager" signature which appears to read "L___ T__y" [sic]. This response was "appealed to Warden/Administrator S.H."(Id. at 35), and on July 29, 2010, the response states "Mr. Hess, The doctor observed the infection on different occasions at morning treatments. **The doctor rec'd the cultures and ordered the antibiotics. The antibiotics you're on is [sic] the correct one, and the area will heal if you are compliant with treatment**." *Signed* "Tristan Tenney HSA." (Id. at 34) (emphasis added). The August 2, 2010 "Action by Warden/Administrator," whose signature was illegible due to poor copy, was "Affirm unit and deny grievance." This response was apparently "Appealed to Commissioner. SH." (Id. at 35).

The second, Grievance # 10-HCC-C-093, is dated July 26, 2010, is addressed to "Unit Manager Thompson," and the nature of the grievance is described by plaintiff as "I went to treatment this morning 7-26-10 to have my bandage changed, the nurse (Rebecca) refused to put a wrap on there even after I explained that it's been bleeding enough to soak through about a ½ inch of gauze. She put 1 bandaid, telling me she wanted to see how much it was bleeding. I again explained to this nurse that it would soak through and get on my pants, still she refused to use the gauze and wrap. *Signed* Steve Hess 28837." (Id. at 23). The Unit Manager's July 26, 2010 response is "fwd to med.," and contains a nearly illegible "Unit Manager" signature which appears to read "L___ T__y" [sic]. This grievance was appealed to "Warden/Administrator S.H." and the response, dated July 29, 2010, states "Mr. Hess, On 7-26-10 your bandage was dressed appropriately, and you were informed if it bled through to return to medical to have it redressed." *Signed* "Tristan Tenney, HSA." (Id. at 26). The August 2, 2010 "Action by Warden/Administrator," was "Affirm unit and deny grievance," and contained a signature apparently provided by another on the Warden's behalf; however, the signature was illegible due to poor copy. This response was apparently "Appealed to Commissioner. SH." (Id. at 27).

The third, Grievance # 10-HCC-C-095, dated August 3, 2010, is addressed to "Unit Manager Thompson," and the nature of the grievance is described by plaintiff as "I received your reply to grievance 10-HCC-90 [sic] on 7-27-10. You state the doctor observed the infection in my leg on several occasions at morning treatment. This is entirely false. I never had an opportunity to speak to or be examined by the doctor during this whole month long ordeal. On one occasion before administering treatment to another individual the doctor peeked at the wound site for approximately 30 seconds. At no other time was I afforded the opportunity to speak to him about the severity of this infection**. This infection was let go by medical staff for 4 days before I was prescribed antibiotics.** I was at medical every day, sometimes twice, trying to get treatment due to the severity of the infection. I requested to see the doctor several times. All to no avail. This was also never cultured until I had been on antibiotics for 4-5 days. Now I'm left with a severe scar because this was let go and I was unable to speak to the doctor or get treatment in a timely manner. My medical chart will show all these event's [sic] to be accurate along with the sign in sheets for this time frame. *Signed* Steve Hess # 28831 8-3-10." (Id. at 17) (emphasis added). The response, dated August 4, 2010, states "Fwd to med," with a nearly illegible "Unit Manager" signature which appears to read "L___ Th__y" [sic]. The August 10, 2010 response states "You have been treated properly. Dr. Proctor also saw you on 8/4/10. All injuries/infections have the potential to scar. *Signed* T. Tenney R.O. [sic]." (Id. at 18). This response was "Appealed to Warden/Administrator S.H." The August 9, 2010 "Action by Warden/Administrator" is "affirm unit and deny grievance," and contained a signature apparently provided by another on behalf of the Warden, which was illegible due to poor copy. This August 12, 2010 response was apparently "Appealed to Commissioner. SH." (Id. at 20).

Finally, plaintiff provides a State of West Virginia Dep't. of Military Affairs and Public Safety Division of

As relief, the plaintiff seeks a declaration from the Court that the prison's failure to quarantine inmates infected with MRSA and other infectious diseases is a violation of the 8th Amendment; monetary damages against the prison officials "under and up to the limits of the states [sic] liability insurance coverage where available;" and "nominal, compensatory, and punitive damages in the respective amounts not below the amount of $2,000,000 (two million dollars)."

## C. The Defendants' Motions to Dismiss and Memoranda in Support (Dkt.# 33 and 34)

In his motion to dismiss, Defendant Hoke states that:

1) plaintiff's claims against him lack merit and his Complaint should be dismissed.

2) HCC has not failed  any inspections, nor have the defendants been "warned" of any unsanitary conditions.  To the contrary, the defendants recently received a 99.7% compliance rating on an ACA audit.  HCC meets and exceeds cleanliness and disinfection procedures and regularly earns yearly permits to operate from the West Virginia Dep't. of  Health & Human Resources,Bureau of Public Health's Office of Environmental Health Services.[5]

3) Further, HCC has policies and procedures in place to disinfect and regularly clean its entire facility using a germicidal disinfectant effective against staph and MRSA;[6] each inmate receives his own bar of antibacterial soap for bathing; HCC regularly uses an exterminator for rodents and insect infestation; further, HCC is cleaned daily, and checked on a daily, weekly and monthly

---

Corrections "Memorandum," dated September 2, 2010, to plaintiff from Central Office Grievance Review, "Thru: Adrian Hoke, Warden HCC," stating "this is a grievance wherein the inmate alleges that he is not receiving the proper health care treatment.  Specifically, the inmate alleges that he has a severe infection in his leg for which he is not receiving the appropriate care.  In responding to grievances related to inmate health care it is desirable that the response contain sufficient information to determine the following: 1) Does the inmate have a serious medical need, and if so; 2) How is the medical unit addressing these needs?  To that end it is necessary to grant this grievance in so far as a review of the inmate's chart and treatment should be reviewed by the Division of Corrections' Health Care Administrator.  Therefore, the following shall occur: 1) MCDO shall forthwith send a synopsis of the inmate's health care and shall also Provide [sic] such portions of his chart as are required to the Division of Corrections' Health Care Administrator.  2) The Health Care Administrator shall undertake a review and coordinate with the Health Care Vendor as to any appropriate recommendations regarding the inmate's treatment.  Cc: Carol Egnatoff, RN, Div'n. Of Corrections Health Care Administrator." (Id. at 15).

[5]Defendant Hoke attaches copies of Permits to Operate a Correctional Facility, issued by the WV Division of Corrections by the State of WV Dep't. of Health & Human Resources for 2006, 2007, 2008, 2009 and 2010 to his response.

[6] Hoke attaches a copy of a label for a PortionPac Sustainable Solutions germicidal detergent and deodorant for commercial, institutional, household, nursing home and industrial use, showing that it is effective against "Escherichia coli (E. Coli) and "Staphylococcus aureus (Staph)." (Dkt.# 33-6 at 1 - 4).

basis.

4) Despite plaintiff's claims otherwise, HCC provides warning to inmates regarding the spread of communicable diseases including MRSA, via posters placed in the library and medical center area.[7]

5) HCC does not have "dangerous levels" of MRSA. Of the over 2,000 inmates who have passed through the facility, less than 1% have been infected with MRSA.[8]

6) The Federal Bureau of Prison Clinical Practice Guidelines does not require that an inmate with a skin infection such as MRSA be isolated; as long as the wound drainage can be contained in a dressing and the inmate is cooperative, he can be housed in the general population.[9] Defendant Hoke did not deny plaintiff medical isolation. If isolation had been ordered by a physician, Hoke would have complied and provided it by transferring plaintiff to the Department of Correction's [D.O.C.] isolation facility at Mount Olive Correctional Center.

7) Being confined with other inmates who have controllable MRSA infection is not cruel and unusual punishment. Illness does not create a cause of action, and contracting an infection is not actionable in this case. Plaintiff cannot show he exposed to a substantial risk of harm; even if he could, he cannot show that Hoke demonstrated deliberate indifference to such a risk. Plaintiff was

---

[7] Hoke attaches a copy of a CDC poster entitled "Personal Prevention of MRSA Skin Infections," dated August, 2010.

[8] Hoke attaches copies of Wexford Health Sources Incorporated's "Health Service Summary" for 2008 - 2010, showing that the average yearly number of MRSA cases seen in a population of over 2,500 inmates at HCC was 38, less than 1%. In 2009, there were 42 cases in a population of over 2,000 inmates, again, less than 1%. And in 2010, there were only 17 cases, less than 1% of the inmate population. He also attaches a copy of a February 28, 2008 memo, stating that MRSA is endemic, or "a permanent fixture that cannot be eradicated, in all prisons and jails nationwide. WV Dept. Of Health advises us not to be concerned just because there are new MRSA cases found, since *new cases should and will be found*, as the MRSA germ is now a permanent part of the environment. Statistically, for an inmate population of 1100, we would expect *330 inmates* to carry the "normal" staph germ, and 10% of those, or *33 inmates*, will normally carry the methicillin-resistant version, MRSA. The graph titled MONTLY [sic] MRSA DATA gives the number of new MRSA cases since January 2006, plotted with the theoretical number of MRSA cases allowable to maintain "Excellent" status . . . The number of cases of MRSA met or exceeded our criteria only 4 times: April 2006, August 2007, and December 2007. The graph titled MRSA: QUARTERLY TRENDS smooths out the lines as it compares quarterly, not monthy [sic] MRSA cases. It shows that, on average, the number of cases stays significantly below the number allowable to remain "Excellent". [sic] A trend, however, can be seen over the last 12 months, showing that the average number of MRSA cases is creeping closer and closer to the maximum allowable. With continued inmate education and adequate identification and treatment of new cases, we hope to keep the actual MRSA cases below the max allowed." (Dkt.# 33-1, 33-2, 33-3 and 33-4).

[9] Hoke attaches a Federal Bureau of Prisons Clinical Practice Guidelines "Appendix 8a Correctional Contact Precautions in the General Population," stating that "[m]edical personnel determine the appropriate housing for an inmate with a skin infection. Inmates with skin infections may be housed in the general population if the wound drainage can be contained in a dressing *and* the inmate is cooperative. Inmates with wounds that have significant drainage should generally be housed in a single cell. In an outbreak situation, inmates with MRSA may be housed together." (Dkt.# 33-7 at 2).

never subjected to a pervasive or unreasonable risk of harm.

8) In this case, Hoke relied on the medical professionals' treatment of plaintiff. Defendant Hoke is a warden, not a medical professional, and as such, he is entitled to qualified immunity, shielding him from personal civil liability for official acts undertaken while acting within the scope of his authority.

Defendants Dr. David Proctor ("Proctor"), Jane Doe (Ally) and Tristan Tenney contend that:

1) plaintiff has failed to state a claim of deliberate indifference to a serious medical need on which relief can be granted.

2) Insofar as plaintiff alleges a claim for medical negligence and/or medical malpractice, those claims should be dismissed. Plaintiff has not complied with the West Virginia Medical Professional Liability Act (the "Act"), has not complied with the Act's Notice requirement; has not provided a screening Certificate of Merit; and has not alleged the necessary elements of proof as required by W.Va. Code § 55-7B-3.

3) All of plaintiff's allegations regarding HCC's purportedly unsanitary conditions, its facility inspection and remediation attempts, if any, are directed toward the management of the facility; they cannot be allegations against defendants Proctor, Ally or Tenney, because these are allegations of violations of the duties of HCC's management, not duties that are within the province of its medical professionals.

4) Plaintiff's allegations that defendants Proctor, Ally and/or Tenney's refused to treat him for three weeks are contradicted by plaintiff's own attached grievance forms. Although plaintiff's MRSA infection was a serious medical condition requiring treatment, the documents he attaches to prove exhaustion of his administrative remedies reveal that: he received antibiotics within four days of first complaining of his infection; the wound was examined by a physician; the wound was cultured; the wound was repeatedly re-dressed or bandaged by the nurse or nurses; and he was seen daily, and sometimes twice daily, in medical, for treatment.

5) Finally, although plaintiff makes specific allegations of medical negligence or medical malpractice and deliberate indifference to his serious medical condition against defendant Ally, he has made no specific allegation against Dr. Proctor at all.

6) Plaintiff's claim of deliberate indifference against defendant Tenney fails, because plaintiff does not allege that Tenney was involved in the treatment of his MRSA infection and thus it appears Tenney has been sued only in a supervisory capacity. However, plaintiff cannot show Tenney is liable in any supervisory capacity, because Tenney: did not fail to provide needed medical care; did not deliberately interfere with the prison doctor's performance; and did not tacitly authorize or exhibit indifference to a prison physician's constitutional violation. Tenney is a nurse, not a doctor, and thus could not prescribe medications. Plaintiff has not alleged that Tenney interfered with the doctor's treatment of his infection; and because he has not made any allegation against Dr. Proctor at all, let alone alleged that Proctor committed any constitutional violation, he cannot show that Tenney knew

about any alleged constitutional violation and failed to act.

7) Plaintiff's claims that no warnings were provided to inmates not already infected with MRSA to help them avoid contracting fails as well; plaintiff admits that the warning posters and memos were posted and distributed; it begs the question how he knew this unless he saw them himself.

8) Plaintiff's claims are merely bald, unsupported allegations and should be dismissed.

## D.  The Plaintiff's Response to the Defendants' Motions to Dismiss (Dkt.# 41)

In his response to the motions to dismiss, the plaintiff reiterates the claims made in his complaint, attempts to refute the defendant's responses, and raises several new claims, asserting that:

1) Plaintiff denies the defendants' claim that "only 1% of the inmate population" at HCC has contracted MRSA through the years.  Plaintiff asserts that he performed his own "survey of the virus [sic]" at HCC and has gathered data suggesting that "almost 20% of the inmate population has contracted the bacteria since 2008 and . . . prison officials have taken efforts to misrepresent the data by failing to diagnose inmates with the STAPH bacteria despite clear evidence of its existence and the treatment provided to these inmates (See, Appendix-A [sic])."[10]  (Dkt.# 41 2 -3).

2) Plaintiff contends that "despite any alleged handouts provided to inmates by the doctor no steps where [sic] actually taken by the prison officials to inform them as to the specific inmates who had already contracted" MRSA,  asserting that in his experience, expecting inmates to protect one another will fail, because "prison inmates tend to look to spreading harmful disease with the hope that the prison would be forced to provide the necessary medical treatment do [sic] to the large number of inmates exposed."  (Id. at 4).

3) Plaintiff raises new allegations that:

> a) inmates working in the kitchen at the prison are: not properly instructed on hand washing; not provided with sanitizers for their work stations.
>
> b) There are "numerous roaches and rats" in the kitchen and elsewhere; and that HCC lacks a "safety control plan" to enforce any policy for sanitizing drinking jugs, cooking pots and food contact surfaces.
>
> c)  HCC has no standard for proper heating and cooling of food; and
>
> d)  the "hot holding equipment in the kitchen do not [sic] work."  (Id. at 6).

4) Plaintiff disputes the defendants' contentions regarding the Permit(s) to Operate and the

---

[10]Plaintiff's response has no attached "Appendix-A."

audits performed by the Health & Human Resources personnel "because they are not performed properly and are therefore insufficient." He further contends that during the inspections, no thermometers are used to check the internal temperature of food; evidence of pest infestations is "simply ignored." (Id.).

5) Plaintiff contends that Defendant Hoke and Proctor are merely blaming one another for the spread of MRSA.

6) Plaintiff specifically denies that he received treatment for his infection within 4 days of going to medical.

7) Finally, plaintiff raises new claims against the medical defendants, alleging that: Dr. Proctor deliberately avoids seeing inmates in order to protect him from liability; the prison nursing staff and defendant Tenney cooperate with this policy by purposefully putting off inmates who seek care; and that "medical" has a "scheme . . . to not diagnose the problems of inmates while providing them antiseptics and pain relievers which do not treat their illnesses but help hide the pain for as long as possible." (Id. at 7).

Plaintiff requests that he be granted the opportunity for discovery, including calling an infectious disease specialist to prove quarantine is necessary to prevent the spread of MRSA, and "an independent expert to inspect the prison utilizing those methods administered to the public for the detection of harmful and dangerous risk to persons who come in contact with such environments," and a trial, in order to resolve the "factual disputes" between the parties.

## E.  The Defendants' Replies to the Plaintiff's Response (Dkt.# 42 and 43)

In their replies to the plaintiff's response, Defendant Hoke states that:

1) plaintiff's response to the defendant's motion to dismiss attempts to improperly present new claims and should therefore be disregarded;

2) Hoke has not violated the prohibition against cruel and unusual punishment;

3) plaintiff's Eighth Amendment claims are self-serving, unsubstantiated assertions that fail to establish a claim of deliberate indifference to inmate health or safety.

4) Plaintiff has not demonstrated a substantial risk of serious harm; he has not even alleged a serious harm.

5) Plaintiff's suggestion that the individual health conditions of other inmates should be shared amongst the prison population is not only absurd, it would also violate Health Insurance Portability

and Accountability Act ("HIPAA") and the privacy rights of inmates.

6) Hoke's actions with regard to the cleaning of HCC are reasonable and appropriate.

7) It is reasonable for Hoke, as Warden, to rely on the opinions, orders and judgment of Dr. Proctor in determining the proper medical care for the plaintiff.

8) Plaintiff has failed to set forth the necessary elements to prove supervisor liability.

9) Warden Hoke is entitled to qualified immunity.

Defendants Proctor, Ally, and Tenney's reply to the plaintiff's response to their motion to dismiss states that:

1) because plaintiff's reply omits mention of his complete failure to comply with the requirements of the West Virginia Medical Professional Liability Act, plaintiff has conceded the point and his supplemental claims for negligence and medical malpractice should be dismissed.

2) Plaintiff's failure to allege the necessary elements for supervisory responsibility under § 42 U.S.C. 1983 indicates he has conceded the point, and therefore his claims against defendant Tenney should be dismissed.

3) Plaintiff's response fails to address the fact that defendants Tenney and Ally are nurses and not physicians, and therefore his claim that they improperly prescribed medications fails and must be dismissed.

4) Because plaintiff's original complaint contained no specific allegation against defendant Proctor, plaintiff's attempt, in his response to the defendants' motion to dismiss, to improperly raise baseless claims against Proctor for the first time must fail. Moreover, plaintiff's new claim that Proctor purposely delayed other inmates' medical treatment, even if true, is not relevant to plaintiff's claim that his own allegedly serious medical condition was treated with deliberate indifference by defendants.

5) Plaintiff's denial that any contention by defendants that he received medical treatment for his MRSA infection within four days is "simply not true" is belied by the grievance documents plaintiff attached to his own complaint.

6) Plaintiff does not dispute that his infection was cured within 5 weeks, or that the wound was treated on a daily basis, or that he did not have a severe medical condition at all, because the infection was cured, leaving him with only a scar the size of a quarter.

7) Plaintiff's assertion that defendants Hoke and Proctor are merely finger-pointing at each other regarding the cleanliness and administration of the prison misses the point. Defendants Proctor and Hoke have two separate and distinct responsibilities: Proctor, as prison physician, makes medical

decisions and Hoke as Warden, makes administrative decisions and is entitled to rely on Proctor's medical decisions. Accordingly, plaintiff's claims regarding unsanitary conditions at the prison and any alleged manipulations by the administration to pass inspections fails to state a claim against Proctor or any of the other medical defendants and should be dismissed.

8) Plaintiff's alleged 'survey' of the opinions of other inmates was not pled in the Complaint; is not evidence; will never be admissible at trial; and cannot form the basis for any claims. Moreover, it seems likely that the same inmates who plaintiff claims would tend to deliberately spread disease within the prison to force a course of action they wished the prison to take would likely be the same ones who would lie in a survey in attempting to accomplish the same goal.

### III.  Standard of Review

#### A.    Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. <u>Advanced Health-Care Services, Inc., v. Radford Community Hosp.</u>, 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

#### B.    Motion for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary

judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

## IV. Analysis

### A. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42

U.S.C. § 1983, is subject to the exhaust of administrative remedies. <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes"[11] and is required even when the relief sought is not available. <u>Booth</u> at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See <u>Porter</u> at 524 (citing <u>Booth</u> at 741) (emphasis added). In addition, the Supreme Court has stated that "we will not read futility or other exceptions into statutory exhaustion requirements . . ." See <u>Booth</u> at 741, n. 6.

The WVDOC has established a three level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues. The first level involves filing a G-1 Grievance Form with the Unit Supervisor. If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator. Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

Here, it appears that there is no question but that the plaintiff has completely exhausted his administrative remedies.

In the Complaint, the plaintiff complains that as a result of unsanitary conditions knowingly permitted to flourish at HCC, he incurred a serious MRSA skin infection on his right leg for which the defendants deliberately denied him treatment for three weeks, during which time the wound grew from a pea-sized area to an area as big as a quarter. He asserts that he suffered excruciating pain and was left with a "severe scar." Finally, the plaintiff implies that the medical treatment he did receive

---

[11] <u>Porter</u> at 524.

was inadequate.

## B. Deliberate Indifference

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[12]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of

---

[12] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kan. 1977). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F.3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F.Supp. 547 (S.D. W. Va. 1995). And arthritis is a serious medical condition because it causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F.Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008).

deliberate indifference requires more than a showing of negligence. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." <u>Id.</u> at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." <u>See</u> <u>Morales Feliciano v. Calderon Serra</u>, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing <u>Brock v. Wright</u>, 315 F.3d 158, 162 (2d Cir. 2003)).

## 1. **<u>Defendant Hoke</u>**

In the complaint, the plaintiff names defendant Hoke in his individual and official capacity as the Warden of the Huttonsville Correctional Center. Plaintiff's claims that Hoke was aware of "dangerous levels" of MRSA at HCC; failed to enact and maintain adequate infection control policies and procedures at HCC; failed to purchase disinfectant sprays to combat infection; failed to warn and

protect plaintiff against the risk of MRSA; "allowed Hess to contract the bacteria" and then delayed his treatment for it all lack merit and have no support in the record.[13] To the contrary, a review of the full record, including the grievance documents provided by plaintiff himself, reveal that plaintiff received regular and appropriate medical treatment for his infection. Hoke's duties as warden, as plaintiff avers in his complaint, were the "day-to-day duty of managing its operations and maintaining the health & safety of its inmates." Plaintiff has not made any credible claims that defendant Hoke was personally involved in the violation of his constitutional rights. Instead, it appears that the plaintiff names defendant Hoke only in his official capacity as the overseer of the prison and its employees.

There is no *respondeat superior* liability under § 1983. See Monell v. Department of Social Services, 436 U.S. 658 (1978); see also Vinnedge v. Gibbs, 550 F. 2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charges acted personally in the deprivation of the plaintiff's rights." Vinnedge, supra. Nonetheless, when a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if a subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v. Washington Metropolitan Area Transit Authority, 690 F. 2d 1113 (4th Cir. 1982). Similarly, a supervisor may be liable under § 1983 if the following elements are established: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response

---

[13] Plaintiff's claim that he was not warned of the danger of MRSA is contradicted by his own admission that pamphlets were handed out and posters were placed in the medical area of the prison warning of MRSA in early 2010. Plaintiff claims he developed the MRSA infection in late June 2010, but the same grievance documents indicate that on July 21, 2010, he reported he had already had the infection for ten days, indicating that it began on July 11, 2010, not June 28, 2010, as alleged in his Complaint.

to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir.), <u>cert. denied</u>, 513 U.S. 813 (1994).[14]

Because the plaintiff fails to allege any personal involvement on the part of defendant Hoke, beyond the unsubstantiated claims that Hoke authorized unsanitary practices at the prison and participated in the fraudulent concealment of them, he does not make any allegations which reveal the presence of the required elements for supervisory liability, the plaintiff fails to state a claim against defendant Hoke.

## 2. **Defendant Proctor**

In the Complaint, the plaintiff makes no specific allegation against defendant Proctor, other than the same conclusory allegations that Proctor, along with all of the other defendants (Dkt.# 20-1 at 4 and 10), knew of HCC's unsanitary conditions and "dangerous levels" of MRSA but failed to warn, to protect and to provide timely treatment (<u>Id</u>.). Plaintiff also makes an unsubstantiated general claim that the prison's "medical staff" provided improper treatment (<u>Id</u>. at 9) but provides no specifics against Proctor himself.

Plaintiff's later claims, made in his response to the defendants' motions to dismiss, allege that Proctor had a "scheme" by which he sought to avoid giving inmates access to medical care within the prison and that Proctor, Tenney and Ally all participated in the scheme. Plaintiff's claim that

---

[14] "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." <u>Shaw</u>, 13 F.3d at 799. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" <u>Id.</u>

defendant Proctor contrived to deny other inmates care is not only unsubstantiated and baseless, it is irrelevant to petitioner's case and will not be given review.

Despite plaintiff's claim in his first grievance form that that he had not been able to "consult[] with the doctor 1 time over this," by July 21, 2010, twenty-four days into the three-week period he alleges he was denied care, he was already on antibiotics, had had the wound cultured and bandaged, and was receiving daily care. (Dkt.# 20-1 at 31). Because antibiotics could only be ordered by a physician and Dr. Proctor was the prison physician, the antibiotics plaintiff received could not have been ordered by anyone other than Proctor. Further, the July 29, 2010 response to the grievance notes that Proctor had observed the infection on different occasions at morning treatments; had received the cultures and ordered antibiotics. (Id. at 37). Plaintiff's second grievance, filed July 26, 2010, complains of a dispute that morning with a nurse (not defendant Ally) over how his wound should be bandaged. (Dkt.# 20-1 at 23). Plaintiff appealed the denial of the grievance on the issue and on July 29, 2010, was advised by defendant Tenney that his wound had been appropriately bandaged and he was advised that if it "bled through" that he was to return to have it re-dressed. (Id. at 26). His third grievance, filed on August 3, 2010, disputes the response to the second, claiming that it was "entirely false" that the doctor had examined him on several occasions, claiming that the doctor only "peeked" at the wound once for "approximately 30 seconds," and reiterating his complaint about a 4-day delay in beginning antibiotic therapy, and alleging that the wound was not cultured until he had been receiving antibiotics for 4-5 days. (Id. at 21).

Plaintiff's complaint appears to be that he did not receive treatment as quickly as he would have liked for his medical condition, and once treatment began, was dissatisfied with the type of care given. Clearly, however, the plaintiff received adequate and appropriate medical treatment from

19

Proctor or as a result of his direction, because his infection was appropriately diagnosed, treated and timely cured. The mere fact that the plaintiff is dissatisfied with his treatment, or disagrees with the course of that treatment, is insufficient to support a claim of cruel and unusual punishment. <u>See</u> <u>Wright v. Collins</u>, *supra.* Accordingly, any claim against Proctor of deliberate indifference to a serious medical condition must fail.

**3. <u>Defendant Ally</u>**

Plaintiff's claim that defendant Ally, a nurse at the prison, despite three weeks[15] of his begging to be put on the list to see the physician, refused to put him on the list, delaying and denying his treatment for his MRSA infection lacks merit and is unsupported by his own grievance documents, *supra.* As well, plaintiff makes the same conclusory allegations that Ally, along with all the other defendants, knew of HCC's unsanitary conditions and "dangerous levels" of MRSA but failed to warn and protect him. Likewise, plaintiff's unsubstantiated general claim that the prison's "medical staff" provided improper treatment provides no credible specifics against Ally.

In his response to the defendants' motions to dismiss, he raises a new claim, that Ally, acting in concert with defendants Proctor and Tenney, participated in a "scheme" by Proctor in which all three conspired to deny or delay other inmates' access to medical care from Proctor. Because this later-made claim is baseless, unsubstantiated, and irrelevant to plaintiff's case, it will not be given review.

Plaintiff's own grievance forms contradict his claims against Tenney. Within four days of first complaining of the infection he had been started on an antibiotic. Moreover, the wound was examined

---

[15]The three-week period plaintiff alleges he was denied care spanned from June 28, 2010 through July 18, 2010.

by a physician as well as repeatedly by the prison nurses; the wound was cultured; the wound was repeatedly re-dressed or bandaged by Ally or other nurses; and by his own admission, plaintiff was seen daily, and sometimes twice daily (Dkt.# 20-1 at 17) in medical, for treatment.

Again, it appears that plaintiff is merely complaining because the treatment he wanted did not begin as quickly as he would have preferred, and he was unhappy with the type of care provided. It is apparent from a review of the record that the plaintiff received regular medical treatment; the treatment was appropriate because it cured his infection. The mere fact that the plaintiff is dissatisfied with that treatment, or disagrees with the course of that treatment, is insufficient to support a claim of cruel and unusual punishment. See Wright v. Collins, *supra.*

### 4. **Defendant Tenney**

Plaintiff's claims against Tenney are unclear. In the Complaint, he names defendant Tenney in both his individual and his official capacity as the HCC medical director. However, the plaintiff does not assert that defendant Tenney was personally involved in the violation of his constitutional rights. Instead, it appears that the plaintiff names defendant Tenney only in his official capacity as the overseer of the prison's medical infirmary and its employees. Plaintiff only alleges that Tenney was aware of the threat to his health and safety but did nothing to protect him and delayed his treatment. As with these same claims made against the other defendants, the claims have no merit.

In his response to the defendants' motions to dismiss, plaintiff raises a new claim, that Tenney, acting in concert with defendants Ally and Proctor, participated in a scheme in which all three conspired to deny or delay other inmates' access to medical care from Proctor. Because this later-made claim is baseless and unsubstantiated as well, but also is irrelevant to plaintiff's case, it will not be given review.

As noted *supra,* there is no *respondeat superior* liability under § 1983.  See  Monell v. Department of Social Services, *supra* at 658.   Plaintiff's vague claims against Tenney are unsupported by the same grievance documents previously mentioned *supra.*   Defendant Tenney appears to have appropriately investigated and responded to plaintiff's grievances about the delivery (or lack thereof) and quality of his medical treatment for MRSA infection.  Because the plaintiff fails to allege any personal involvement on the part of defendant Tenney, he does not make any allegations which demonstrate the required elements for supervisory liability, the plaintiff fails to state a claim against defendant Tenney.

### C.  Medical Negligence and Medical Malpractice

Plaintiff's complaint against all four defendants generally, but against Proctor, Ally and Tenney specifically, alleges a state supplemental claim of medical negligence and malpractice. Leaving aside for the moment that plaintiff's medical negligence and/or malpractice claim against Hoke, even if properly pled, must fail, because Hoke is not a medical professional, because plaintiff has not complied with the  statutory requirements of the West Virginia Medical Professional Liability Act, much less set forth sufficient grounds to state a claim, these claims against all the defendants must fail.

### V.  Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motions to Dismiss (Dkt.# 33 and 34)  be **GRANTED** as to all defendants.  Accordingly, it is the undersigned's recommendation that plaintiff's claims against all the defendants be **DENIED** and **DISMISSED with prejudice** pursuant to 28 U.S.C. §§ 1915A and 1915(e) for the failure to state a claim.

**Within fourteen (14) days** after being served with a copy of this recommendation, any party

may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated: August 31, 2011

/s/ James E. Seibert

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE